**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA, |
| v. |
| DWAYNE T. DOLBERRY, |
| Defendant. |

Criminal Case No. 15-0037
Judge Beryl A. Howell

**MEMORANDUM OPINION**

Defendant Dwayne Dolberry is charged with one count of Unlawful Possession of a

Firearm and Ammunition by a Person Convicted of Crime Punishable by Imprisonment for a

Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1), arising from the seizure of a

loaded Keltec 9mm semi-automatic handgun from his person at the time of his arrest in March

2015.  Indictment, Count One, ECF No. 3.  The defendant has now moved to suppress all

physical evidence seized from, and all statements made by, him in connection with his arrest.

Def.'s Mot. to Suppress ("Def.'s Mot."), ECF No. 10.  Upon consideration of the memoranda of

law submitted by the defendant and the government, and the testimony and exhibits presented at

a suppression hearing on August 3, 2015, for the reasons set forth below, the defendant's motion

is denied, except with respect to an issue conceded by the government.

**I.      BACKGROUND**

On the evening of March 17, 2015, shortly after 5:00 p.m., Officer John Wright of the

Metropolitan Police Department's ("MPD") Gun Recovery Unit ("GRU") was on duty in the

Trinidad neighborhood of Northeast, Washington, D.C.  Rough Transcript of Suppression

Hearing ("Hearing Trans.") at 8–10, *United States v. Dolberry*, No. 15-cr-037 (Aug. 3, 2015)

(testimony of Officer John Wright).[1]  Officer Wright was driving an unmarked, gray Ford

Explorer, with passengers MPD Officer Vaillancourt and Bureau of Alcohol, Tobacco, Firearms

and Explosives ("ATF") Special Agent Srivastava, headed to a gas pump on the 1800 or 1900

block of West Virginia Avenue.  *Id*. at 10–11, 16, 36.  The officers, including Officer Wright,

were dressed casually, but also wore police vests labeled with the word "police" on the front and

the back and belts with police "accoutrements," including a firearm.  *Id*. at 10, 44–45.[2]

At approximately 5:19 p.m., when the officers were located "right by the gas pump," they

heard a radio dispatch from the Fifth District about a "man with a gun," described as "a black

male, black jacket, blue jeans, around 20 years of age," located at "1275 Meigs" Place and last

seen in "an alley."  *Id*. at 11–12, 15–16.  With Officer Wright "flooring it," the officers

immediately responded to the vicinity of 1275 Meigs Place by making a left on Mt. Olivet Road

and a right on Montello Avenue.  *Id*. at 16, 19.  Officer Wright did not recall ever using the

vehicle's siren, but testified that, if he had, "it may have been for a split second crossing West

Virginia onto Mt. Olivet."  *Id*. at 24.  The officers' vehicle "arrived at the block at a high rate of

speed" but went "slower through the block" so that the officers could look up and down the

alleys they passed.  *Id*. at 47.  Officer Wright testified that they traveled approximately "under

half a mile" and it took "maybe a minute" for him to get from the 1900 block of West Virginia

Avenue to the 1200 block of Meigs Place.  *Id*. at 54, 60.

The officers encountered defendant Dolberry at the intersection of Meigs Place and

Trinidad Avenue.  *Id*. at 18.  The defendant was walking southbound on the west side of Trinidad

---

[1] The Court's citations to the transcript are from the court reporter's draft of the proceedings.

[2] Officer Wright inventoried the supplies that he carried:  his police vest contained his "radio, satellite microphone for the radio, flashlight, . . . cell phone or a wallet, notebook, pens, marker," "maybe some small little bags," "a pry tool," and "a badge," Hearing Trans. at 45, and his belt contained "a firearm, handcuffs, OC spray, extra magazines, [and] rubber gloves," *id*. at 44–45.

Avenue, in a direction facing towards the officers' vehicle.  *Id.* at 21.  Officer Wright noticed the defendant because he matched the radio description—he is a black male, and was wearing blue jeans and what Officer Wright originally thought was a black jacket.[3]  *Id.* at 21, 60–61. Photographs from the scene show that, in addition to blue jeans, the defendant was wearing a black long-sleeved shirt with a black vest, a baseball cap, glasses, and gold chains around his neck.  *Id.* at 43; Gov't Ex. 4.  Officer Wright testified that upon seeing the vehicle, the defendant "seemed startled" and his "eyes kind of got wide."  Hearing Trans. at 21.  Officer Wright stopped the vehicle "at or prior to the crosswalk" and greeted the defendant from inside of the vehicle. *Id.* at 21, 25.  The defendant stopped; he did not flee.  *Id.* at 25, 51.  As Officer Wright got out of the vehicle and began walking towards the defendant, he asked the defendant in a "calm and matter of fact" tone of voice "if he had anything on him" and "told him that we had just gotten a call," sounding "kind of apologetic . . . to keep whatever situation may be there calm."  *Id.* at 25, 50, 52.  The defendant did not respond.  *Id.* at 25.  Officer Wright then asked the defendant in a calm, conversational tone "if I could pat him down."  *Id.* at 25–26.  The defendant "said yes, and he moved his arms away from his body" calmly.  *Id.* at 26.  When Officer Wright patted down the defendant, he "felt, on the left side of his jacket, a hard metal object he believed to be a firearm."  *Id.* at 27.

Upon feeling what he believed to be a firearm, Officer Wright wrapped his arms around the defendant and turned him towards the police vehicle as the other officers exited the vehicle. *Id.*  The defendant, with a "calm but defeated" demeanor, said something to the effect of, "y'all

---

[3] Officer Wright recognized the defendant and knew who he was.  Hearing Trans. at 41.  He testified that the defendant "is someone in the neighborhood that gleans respect from the neighborhood.  He's always been courteous and respectful any time I had an interaction with him, be it in passing or speaking.  He carries himself like a mature person." *Id.* at 42.  Officer Wright had never before, however, stopped, arrested, or participated in an arrest of the defendant. *Id.* at 59.

got me; y'all got me.  It's all good.  I'm not going anywhere," in what Officer Wright perceived

to be an attempt to deescalate the situation.  *Id*. at 27–28.  The defendant was placed in handcuffs

without resisting.  *Id*. at 28.  After the defendant was placed in handcuffs and shackles to prevent

him from running away, Officer Wright "asked him why he didn't run."  *Id*. at 31.  The

defendant responded with "something to the effect that he was ready to go back to jail, that he

knew this was coming."  *Id*.  Officer Wright approximated that "maybe 30 or 40 seconds" passed

between his initial sighting of the defendant on the sidewalk until the time he restrained the

defendant in a bear hug.  *Id*. at 54–55.

At approximately 5:20 p.m., Officer Vaillancourt called in and informed the radio

dispatcher that "the individual [was] stopped, and the weapon recovered."  Notice of Filing of

Rough Trans. of Excerpted Audio Recording in Gov't Ex. 1 ("Audio Recording Trans.") at 2,

ECF No. 16; *see also* Hearing Trans. at 61.  Officers recovered from the left breast pocket of the

defendant's vest a loaded 9mm semi-automatic handgun.  *See* Hearing Trans. at 29.

## II.    LEGAL STANDARD

### A.    Physical Evidence

The Fourth Amendment prohibits law enforcement from conducting "unreasonable

searches and seizures," and "this protection extends to a brief investigatory stop of persons . . . ,

whether or not an arrest follows."  *United States v. Bailey*, 622 F.3d 1, 5 (D.C. Cir. 2010) (citing

*United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Terry v. Ohio*, 392 U.S. 1, 9 (1968); and

*United States v. Cortez*, 449 U.S. 411, 417 (1981)).  When the government conducts an

unconstitutional search or seizure, the Court must exclude any evidence obtained as the "fruit" of

that search or seizure.  *Wong Sun v. United States*, 371 U.S. 471, 484 (1963); *United States v.*

*Matthews*, 753 F.3d 1321, 1324 (D.C. Cir. 2014) ("The admissibility of all the incriminating

evidence . . . depends upon the validity of the search."). For suppression of the evidence, the defendant must first establish that he was subjected to a search or seizure without a warrant, and then the burden shifts to the government to justify the warrantless search or seizure. *See* United *States v. Brodie*, 742 F.3d 1058, 1063–64 (D.C. Cir. 2014); *United States v. Williams*, 878 F. Supp. 2d 190, 197 (D.D.C. 2012) (citing cases).

### B.     Statements

The Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id*. at 444. The well-settled procedural safeguards of *Miranda* require that law enforcement agents give the defendant, prior to such a custodial interrogation, warnings "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id*. at 479. These procedural requirements of *Miranda* apply, however, only when there is a custodial interrogation. *See United States v. Vinton*, 594 F.3d 14, 26 (D.C. Cir. 2010) ("*Miranda* warnings are required where a suspect in custody is subjected to interrogation." (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)) (internal quotation marks omitted)).

## III.   DISCUSSION

The defendant's motion to suppress the loaded gun seized from his vest pocket is discussed first, followed by consideration of his motion to suppress the statements he made to the police both before and after his arrest.

### A.      Physical Evidence

The defendant seeks to suppress the gun and ammunition recovered from his person, arguing that this search and seizure was unlawful because the officers lacked reasonable suspicion to stop and frisk him.  Def.'s Mot. at 2–3; Hearing Trans. at 75–76.  The government responds that the defendant was not stopped or seized within the meaning of the Fourth Amendment until after he consented to a pat-down, at which point there was probable cause for his arrest.  Gov't Opp'n to Def.'s Mot. to Suppress Physical Evidence & Statements ("Gov't Opp'n") at 4–6, ECF No. 12; Hearing Trans. at 65.

Generally, "searches [and seizures] must be supported by a warrant obtainable upon a showing of probable cause," *United States v. Jackson*, 415 F.3d 88, 91 (D.C. Cir. 2005), but "[a]s an exception to the Fourth Amendment's warrant requirement, officers may conduct a brief investigative '*Terry* stop' so long as they have 'reasonable, articulable suspicion' of criminal conduct," *United States v. Goddard*, 491 F.3d 457, 460 (D.C. Cir. 2007) (per curiam) (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).  While "*Terry* stops require only that officers have a 'minimal level of objective justification,'" *id*. (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984)), "[t]he prohibition against unreasonable seizures requires that all seizures, even ones involving 'only a brief detention short of traditional arrest,' be founded upon reasonable, objective justification," *United States v. Gross*, 784 F.3d 784, 786 (D.C. Cir. 2015) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)).

The law is clear that "not all interactions between police officers and citizens amount to a 'seizure' for Fourth Amendment purposes."  *Id.*  "A Fourth Amendment seizure occurs only when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen."  *Id*. (quoting *Terry*, 392 U.S. at 19 n.16 (1968)) (internal quotation marks

omitted).  No seizure has taken place "[u]nless a reasonable person would have believed that he

was not free to leave."  *Id.* at 787 (quoting *United States v. Maragh*, 894 F.2d 415, 418 (D.C. Cir.

1990)) (internal quotation marks omitted).  This "reasonable person test asks . . . what a

reasonable man, innocent of any crime, would have thought had he been in the defendant's

shoes."  *Id.* (quoting *Goddard*, 491 F.3d at 460) (internal quotation marks omitted).

The D.C. Circuit recently emphasized, in *United States v. Gross*, the "settled principle

that a seizure does not occur simply because a police officer approaches an individual and asks a

few questions."  *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)) (internal quotation

marks omitted).  The Court explained,

> Even when officers "have no basis for suspecting a particular individual, they
> may generally ask questions of that individual . . . as long as the police do not
> convey a message that compliance with their requests is required."  And, "[w]hile
> most citizens will respond to a police request, the fact that people do so, and do so
> without being told they are free not to respond, hardly eliminates the consensual
> nature of the response."

*Id.* (internal citation omitted; alterations in original) (quoting *Bostick*, 501 U.S. at 435, and

*United States v. Drayton*, 536 U.S. 194, 205 (2002)).

While it is the government's burden to justify a warrantless seizure, *see United States v.*

*Brodie*, 742 F.3d at 1064, the defendant bears the burden to show that a seizure has occurred in

the first place, *see United States v. Williams*, 945 F.2d 192, 196 (7th Cir. 1991) ("If the initial

encounter was entirely consensual such that no seizure occurred, then the government has no

burden to show any degree of suspicion, and the [evidence seized] is not the fruit of an

unconstitutional act.").  Certain factors must be present for what has been termed "an ordinary

encounter" to rise to the level of a seizure, thereby implicating the Fourth Amendment.  These

factors include, "the threatening presence of several officers, the display of a weapon by an

officer, some physical touching of the person of the citizen, or the use of language or tone of

voice indicating that compliance with the officer's request might be compelled." *Goddard*, 491 F.3d at 460 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).  Courts additionally consider "the demeanor of the approaching officer, . . . whether the officer wore a uniform, and the time and place of the encounter." *Id.* (internal quotation marks and citations omitted).  "By itself, the presence of a police car is an insufficient show of authority to make a reasonable, innocent person feel unfree to leave," particularly "where the officers d[o] not use their siren or flashers, d[o] not command the defendant to stop, d[o] not display their weapons, and d[o] not drive aggressively to block or control the defendant's movement." *Id.* at 461. Similarly, "the presence of multiple officers" wearing "gear, including guns and handcuffs" "does not automatically mean a stop has occurred." *Id.*  "There must be some additional conduct by the officer[s] to overcome the presumption that a reasonable person is willing to cooperate with a law enforcement officer." *Id.* (quoting *Gomez v. Turner*, 672 F.2d 134, 142 (D.C. Cir. 1982)).

Here, nothing indicates that a stop or seizure occurred when Officer Wright approached the defendant and asked if he would consent to a pat-down.  Officer Wright did not use sirens when approaching the defendant nor did he drive aggressively to block to the defendant's movement.  Similarly, Officer Wright—the only one of the three officers to first approach the defendant—did not command the defendant to stop, nor did he did display any weapons. Instead, Officer Wright stopped the police vehicle at the edge of the crosswalk and greeted the defendant.  He then stepped out of the vehicle, calmly walked toward the defendant, and asked the defendant if he "had anything on him."  Under our binding precedent, this, without more, did not constitute a *Terry* stop. *See Gross*, 784 F.3d at 788.[4]

---

[4] At the hearing, defense counsel attempted to distinguish *Gross* from the instant case, arguing that the officers in *Gross* had been cruising around the neighborhood on an open-ended investigation.  Hearing Trans. at 76.  By

Officer Wright then requested the defendant's consent to perform the pat-down. "[A] search conducted pursuant to a valid consent is constitutionally permissible" and "wholly valid." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *see also United States v. Ashley*, 37 F.3d 678, 679 (D.C. Cir. 1994) ("[A] suspect's objectively reasonable consent to a body search indicates consent to a traditional frisk search . . . ." (internal quotation marks and citation omitted)). "[W]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Schneckloth*, 412 U.S. at 222 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). For consent to be valid, it must be freely and voluntarily given. *Id.* "[T]he question whether a consent to a search was in fact 'voluntary' or was the product or duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227. Thus, "[i]n determining the voluntariness of a consent, a district court must examine the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *United States v. Rodney*, 956 F.2d 295, 297 (D.C. Cir. 1992) (quoting *Schneckloth*, 412 U.S. at 226) (internal quotation marks omitted); *see also United States v. Wilson*, 605 F.3d 985, 1027 (D.C. Cir. 2010) (per curiam). "Relevant factors include: the youth of the accused; his lack of education; or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; and the use of physical punishment . . . ." *Rodney*, 956 F.2d at 297 (quoting *Schneckloth*, 412 U.S. at 226). "In examining all the surrounding circumstances to

---

contrast, here, the defense argued, officers were responding to an anonymous tip about a man with a gun, "in kind of an investigatory mode." *Id.* This is a distinction without a difference. The court's decision in *Gross* was predicated on the distinction between those factual circumstances which render a citizen's interaction with police consensual or push it into the realm of a *Terry* stop. *See* 784 F.3d at 787–88. For these purposes, the factual circumstances here are virtually indistinguishable from those in *Gross*. *See id.*

determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Schneckloth*, 412 U.S. at 229.  "[I]f under all the circumstances it has appeared that the consent was not given voluntarily—that it was coerced by threats or force, or granted only in submission to a claim of lawful authority—then" "the consent [is] invalid and the search unreasonable."  *Id.* at 233.

Here, sufficient evidence was presented at the evidentiary hearing through the credible testimony of Officer Wright that the defendant freely and voluntarily gave his consent to a frisk. The defendant is a mature adult, who had previously engaged in interactions with Officer Wright.  The evidence is undisputed that Officer Wright asked the defendant a direct question whether he consented to a pat-down and that he clearly heard the defendant say "yes."  This affirmative answer was corroborated by the defendant's actions in raising his arms to facilitate the pat-down.  The context in which consent was given was not sufficiently coercive to render the consent invalid.  Although there were three officers on the scene, only one had exited the vehicle and was speaking to the defendant.  Additionally, no guns were drawn, the conversation took place on a public sidewalk, and the defendant's way was not blocked by the car or other officers on the scene.

At the hearing, the defense disputed the credibility of Officer Wright's testimony, contending that the timing of events as he testified to them was not possible.  *See, e.g.*, Hearing Trans. at 62–63, 73–76.  More specifically, the defense argued that the officers could not possibly have traveled from their initial location at or near a gas pump on West Virginia Avenue to where they encountered the defendant in under one minute, as captured in the real-time audio recording of the radio broadcast of the event, *see id.* at 15; Gov't Ex. 1, particularly at five

o'clock in the evening in Washington, D.C., *see* Hearing Trans. at 73. As a consequence, the defense argued, none of Officer Wright's testimony about the defendant's alleged consent should be believed. *Id.* at 75.

The defendant's suppression motion rests largely on whether Officer Wright's testimony regarding his interaction with the defendant is credible and, in particular, whether the events culminating in the defendant's arrest unfolded at a speed that casts doubt on the officer's rendition of what occurred. The D.C. Circuit provides the "greatest deference" to a district court's credibility determinations unless the "district court credits exceedingly improbable testimony." *United States v. Delaney*, 651 F.3d 15, 18 (D.C. Cir. 2011) (quoting *United States v. Mapp*, 476 F.3d 1012, 1017 (D.C. Cir. 2007)) (internal quotation marks omitted). Such improbable testimony may be established when "empirical evidence contradicts the testimony heard by the district court," or when "there is such clear contradiction between the witnesses as would demonstrate clear error to credit either or both witnesses' testimony." *Id.* at 19. In cases "where an officer's credibility is so impugned as to require exclusion of his testimony," however, the D.C. Circuit has noted that "the problems with the officer's account are numerous and bear directly on the contested issue." *Id.* The defendant attempts to squeeze this case into that category of problematic cases by citing the "empirical evidence" of the short time that elapsed between the radio dispatch relaying the description of the "man with a gun" and the arrest of the defendant.

The Court disagrees, and finds no reason to doubt Officer Wright's credibility. As the government pointed out at the hearing, *see* Hearing Trans. at 79, driving approximately a half-mile in one minute is possible while traveling at thirty miles per hour. Also, review of the real-time audio recording of the radio call indicates that the radio broadcast for the "man with a gun"

11

occurred a little over two minutes before Officer Vaillancourt called in to the dispatcher and announced, "We have that individual stopped, and the weapon recovered."  Gov't Ex. 1; Audio Recording Trans. at 1, 3.  Based on the short distance traveled and Officer Wright's testimony that he was "flooring it," as well as Officer Wright's uncontroverted testimony that the defendant stopped right away, readily consented to a pat-down, and was completely cooperative, the Court finds highly plausible that the entire event at issue occurred in about two minutes.  In other words, the empirical evidence in this case, in the form of the dispatch recording, corroborates rather than contradicts, Officer Wright's testimony.

Consequently, because the only evidence indicates that the defendant freely and voluntarily consented to the frisk, the frisk was constitutionally permissible and did not violate his Fourth Amendment rights.  Moreover, when Officer Wright felt an object readily identifiable as a weapon, he developed probable cause to confiscate the gun and arrest the defendant.  *See, e.g., Sibron v. New York*, 392 U.S. 40, 44 (1968) ("If the police officer finds such a weapon or any other thing the possession of which may constitute a crime, he may . . . arrest such person."); *see also United States v. Askew*, 529 F.3d 1119, 1134 (D.C. Cir. 2008) (en banc) (indicating that, had the search been allowable under the Fourth Amendment, the resulting arrest upon finding a gun during the search was allowable); *see also Ashley*, 37 F.3d at 679 ("[I]f an officer discovers, during a pat-down search of the outer garments, an object 'whose contour or mass' makes it readily identifiable as contraband, its seizure is justified." (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993))).  *Cf. United States v. Holmes*, 505 F.3d 1288, 1292 (D.C. Cir. 2007) ("[A]n officer conducting a legitimate *Terry* stop who 'discover[s] contraband other than weapons . . . cannot be required to ignore the contraband, and the Fourth Amendment does not

require its suppression.'" (quoting *Michigan v. Long*, 463 U.S. 1032, 1050 (1983)) (alterations in original)).

### B.    Statements

Defendant Dolberry has also moved to suppress statements he made in connection with his arrest.  Specifically, the defendant requests suppression of (1) his statement "yes" giving consent to the pat-down, (2) his statement upon his arrest to the effect of "y'all got me . . . I'm not going anywhere," and (3) his statement in response to Officer Wright's question asking him why he did not run from police to the effect of "I was ready to go back to jail."  Def.'s Mot. at 4–6.

To prevail on a motion to suppress statements obtained in violation of *Miranda*, the defendant must show that the statements resulted from custodial interrogation.  *See Miranda*, 384 U.S. at 444; *Vinton*, 594 F.3d at 26–27.  A custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *Miranda*, 384 U.S. at 444.  Thus, for *Miranda* to apply, the defendant must be in custody and an interrogation must be taking place.  *Vinton*, 594 F.3d at 26.

For the reasons previously discussed, the defendant was not in custody or otherwise detained when he responded "yes" to Officer Wright's request for consent to frisk him.  Thus, that statement was made freely and not obtained in violation of *Miranda*.

With respect to the defendant's second statement to the effect of "y'all got me . . . I'm not going anywhere," the government does not dispute that the defendant made the statement while in custody, as he made the statement while under formal arrest.  *See* Gov't Opp'n at 3.  Thus, it is clear that the custodial prong of the *Miranda* test is met with respect to this statement, *see United*

13

*States v. Gaston*, 357 F.3d 77, 82 (D.C. Cir. 2004) ("The ultimate inquiry . . . is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." (internal quotation marks and citations omitted)), and the issue turns on whether the defendant was subject to interrogation at the time. "Interrogation, as conceptualized in the *Miranda* opinion, requires a measure of compulsion above and beyond that inherent in custody itself." *United States v. Morton*, 391 F.3d 274, 276 (D.C. Cir. 2004) (quoting *Innis*, 446 U.S. at 300) (internal quotation marks omitted). The test is whether the police action was "reasonably likely to elicit an incriminating response." *Id.* (quoting *Innis*, 446 U.S. at 301).

Here, there is no evidence that the police did anything reasonably likely to elicit an incriminating response from the defendant. The officers were arresting the defendant but were not questioning him at all when he made the statement, nor did the officers do anything to "compel" the defendant to incriminate himself. The defendant was therefore not under interrogation, *see Morton*, 391 F.3d at 276, and the statement need not be suppressed.

With respect to the defendant's third statement to the effect of, "I was ready to go back to jail," the government originally conceded in its papers that the statement falls under the scope of *Miranda* since the statement was made when the defendant was in custody and in response to a police officer's question. Gov't Opp'n at 3. The government thus represented that the statement would not offered by the government in its case-in-chief at trial. *Id.* The government nevertheless requested at the hearing a "ruling on the voluntariness" of the statement "for the purposes of possible impeachment." Hearing Trans. at 4–7. *See United States v. Murdock*, 667 F.3d 1302, 1305–1306 (D.C. Cir. 2012) ("In order to introduce statements at trial—whether in its case in chief or as impeachment evidence—the government bears the burden of proving that the

statements were voluntary." (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972))).  The Court

reserves ruling on this issue until trial, when and if the need arises.

## IV.    CONCLUSION

For the foregoing reasons, the defendant's motion to suppress is GRANTED IN PART

and DENIED IN PART.  Specifically, the motion is DENIED with respect to the physical

evidence recovered from the officers' search of the defendant's person and two of his statements,

noted above.  The defendant's motion is GRANTED AS CONCEDED with respect to the

defendant's third statement, to the effect of "I was ready to go back to jail" in response to an

officer's question, and the Court RESERVES ruling on the voluntariness issue.

An Order consistent with this Memorandum Opinion will be contemporaneously entered.

Date: August 11, 2015


_____
BERYL A. HOWELL
United States District Judge